UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------X
JASIEM WILLIAMS,

                Petitioner,

       - against -

SUPERINTENDENT McGINNIS,
Southport Correctional Facility,

                Respondent.
--------------------------------------------X

<u>MEMORANDUM & ORDER</u>
04-CV-1005 (NGG)

GARAUFIS, United States District Judge.

<u>Pro se</u> petitioner Jasiem Williams ("Williams")[1] brings this application for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254. He is currently incarcerated in Auburn Correctional

Facility, located in Auburn, New York. Williams challenges his convictions rendered in New

York Supreme Court, Kings County for murder in the second degree (New York Penal Law §

125.25[1]) and criminal possession of a weapon in the second degree (New York Penal Law §

265.03). For the reasons set forth below, his petition is DENIED.

## I. BACKGROUND

*A.    Factual Background and Trial*

On May 6, 1999, at approximately 8:30 p.m., Santo Risin ("Risin")[2] was shot in the head

inside a crack house located at 1430 Eastern Parkway in Brooklyn, New York. (Williams's Brief

in Support of Writ of Habeas Corpus ("Williams's Br.") at 1). Williams was charged in Kings

---

[1] Williams is also referred to as "Goldie" and "Funny" in the trial transcript.

[2] Risin is also referred to as "Santo," "Santos," "Pop," and "Green Eyes" in the trial
transcript.

1

County with two counts of murder in the second degree and criminal possession of a weapon in the second and third degrees. (Affidavit of Cynthia Kean ("Kean Aff.") ¶ 5). At trial, three witnesses gave testimony implicating Williams in the murder: Rose Johnson ("Johnson"), Marie Folson ("Folson"), and Gilliam Needham ("Needham"). In addition to these three witnesses, Police Officer Wayne Oliveria ("Officer Oliveria"), Paramedic William Bohr ("Bohr"), Detective Robert Schulman ("Detective Schulman"), Detective William Gallagher ("Detective Gallagher"), and Dr. Steven Shapiro ("Dr. Shapiro") also testified at trial.

     1.     Johnson's Testimony

Rose Johnson, the first witness, had a lengthy criminal record which included a 1998 conviction for attempted assault in the third degree, a 1996 conviction for criminal possession of controlled substance in the third degree, a 1994 conviction for criminal possession of a controlled substance, a parole violation in 1996, and another in 1998. (Johnson T. at 35-36).[3] At the time of Williams's trial, Johnson was incarcerated for a third parole violation. (Id. at 34). Johnson testified that she frequented 1430 Eastern Parkway to purchase and smoke crack cocaine. (Id. at 39-40). She also testified to having purchased crack from Williams on "plenty of occasions." (Id. at 40).

Johnson testified that on May 6, 1999, she was waiting for Risin, with whom she often met to smoke crack, in front of 1430 Eastern Parkway. (Id. at 39, 41). She saw Risin come inside the building, and proceed into Folson's apartment, located in the rear portion of the building. (Id. at 41). Johnson then went upstairs to the second floor, and when she came outside in front of the building, she heard an argument between Williams and Risin. (Id. at 43).

---

[3] "T" refers to the trial transcript. The name preceding refers to the witness testifying.

2

Williams asked Risin, "what you got in your pocket?" (Id. at 43-44). Risin replied, "don't worry about what I have in my pocket. Did I ask you what you have in your pocket." (Id. at 43-44). Williams responded, "are you getting smart with me?," to which Risin replied, "take it how you want to take it?" (Id. at 44). Johnson testified that she then heard Williams say, "I go get my gun and come back and shoot you." (Id.). At that time, Johnson took the staircase back to the second floor of the building, from where she saw Williams, along with "Ray Ray,"[4] and "B," exit the building, and then immediately return. (Id. at 45-46). Johnson then heard Ray Ray, who used to sell drugs, and B say "no, don't do it," and then a gun shot, which she thought to be a firecracker. (Id. at 47, 57). After the shot, she saw Williams, Ray Ray, and B exit the building. (Id. at 48). Johnson also testified to having seen Ray Ray with a small gun, either a .22 or .25 caliber, earlier that day. (Id. at 58).

At that point, a man known as "Car Wash" entered the building and proceeded towards Folson's apartment. (Id. at 49). Johnson testified that she then came downstairs and saw Risin lying on his back on the kitchen floor. (Id.). She knocked on the basement door to call the building's superintendent and told him that something was wrong with Risin. (Id.). Johnson testified to having initially thought that Risin had not been shot, but rather "got ahold of some bad crack." (Id.). Car Wash then called the police, and when the police came, Johnson fetched Risin's brother and sister. (Id. at 49-50). Johnson further testified that Williams, Ray Ray, and B walked up to her and Risin's siblings, and asked what happened. (Id. at 51).

Johnson admitted to having smoked crack cocaine on the day of the shooting. (Id. at 55).

---

[4]Ray Ray is also referred to as "Raymond Bullock" in Williams's brief accompanying the writ of habeas corpus.

She also testified that she did not speak to the police officers when they arrived at 1430 Eastern Parkway, but spoke to them at midnight after smoking some more crack. (Id. at 70-71). She also admitted to using a false name of "Rose Jones" when she spoke to the police that evening. (Id. at 55). Johnson explained that she used the name Jones because she was "running from parole and [] had a parole warrant." (Id. at 70).

2.    Folson's Testimony

Marie Folson admitted on the stand to drinking heavily, and stated that people would consider her an alcoholic. (Folson T. at 87). She testified that she had been drinking "quite a bit" on the day of the shooting. (Id. at 115). She also admitted to having been convicted of several crimes including petit larceny, disorderly conduct, and reckless endangerment. (Id. 87-88). Folson testified that she was in her apartment at 1430 Eastern Parkway on the evening of May 6, 1999, with the door ajar, when she heard Williams and Risin argue in the first floor common area over Risin "disrespecting" Williams. (Id. at 92-93). Folson witnessed Williams leaving the building and returning with a gun. (Id. at 94). She then saw Williams point a gun at the right side of Risin's head, just above his ear, and saw Risin "hit the floor." (Id. at 96). Although she did not hear a gun shot, she saw Risin bleeding from the side of his head. (Id. at 105-6). Folson testified that she did not think Risin had been shot, but rather told police that she thought he was having a seizure. (Id.).

On cross-examination, Folson admitted that when she was questioned by the police, she lied by telling them that she was asleep during the incident. (Id. at 104-5). She explained, "I was scared as hell to say the truth. . . ." (Id. at 105). Defense counsel also tried to impeach Folson's credibility with a prior inconsistent statement. In her prior statement before the Grand Jury,

Folson had attested that there was a search for a gun after the shooting.  (Id. at 118-19).  At the

trial, however, Folson testified that no one had been looking for a gun after the shooting.  (Id.).

When asked about a previous reckless endangerment charge to which she had pled guilty, Folson

explained that she had set her shirt on fire while hospitalized in a mental ward for approximately

one month sometime around 1987.  (Id. at 107).  Folson also testified to having spent time during

the 1980's in "quite a few" mental hospitals.  (Id.).  She testified that she had not informed the

District Attorney of her history of mental illness because he had never asked.  (Id.).

  At this point in the trial, a discovery matter arose with respect to Folson's mental health

records.  Williams's counsel requested copies of Folson's medical records from the various

mental institutions in which she was treated.  (Id. at 134-35).  Counsel also requested the

opportunity to call Folson back for further cross-examination.  (Id.).  The prosecutor responded

that Folson did not tell him about her mental history, and that he had complied with defense

counsel's request to obtain any records regarding her treatment programs, of which Folson

apparently had none.  (Id. at 135).  At that time, the court directed subpoenas to be drawn up, (id.

at 136), which were issued on that very day.  (T. at 243).

  At a subsequent discussion of the issue which followed the testimony of other witnesses,

the court indicated that the medical records at issue were "clearly not Giglio [material] . . . but

somewhere within Rosario and Brady."  (T. at 244).  The court indicated to defense counsel that

he was free to question Folson further.  (Id.).  Counsel responded, "but I need something that I

can base my cross-examination on and that would be the medical records."  (Id.).  The court

asked defense counsel if he would seek an adjournment if the records did not come in by the

following day when the summations and jury charge were set to take place.  (Id. at 244-45).  It

was decided that they would wait to see if the records came in the following day before making any decision.  (Id. at 245).

The next day, the court expressed its plan to hold summation and charges on the following day, and directed the prosecution to have Folson available for cross-examination should the medical records become available in advance.  (Id. at 249).  The Judge stated:

> As far as I'm concerned, the district attorney has done everything he could do.  The Giglio matter that you raised I don't think applies here.  But as you know yesterday I signed the subpoena duces tecum to get those records. . . .
>
> Tomorrow if the records are here, or if you want to recall her, you have that option, even though I don't think under the law you're entitled to.  But it's a homicide case and I don't want to argue that point.  I'm just telling you I don't think you have a right to it.  But I am doing it.  As I said, this is a homicide and I want to do everything possible to be of help to you.

Id. at 249-50.  It was decided that summation and jury charge would occur the next day, and that Folson would be available to testify in the morning if the need arose.  (Id. at 250-51).  The records did not arrive on time, and the defense chose not to cross-examine Folson for a second time without the records.  (Id. at 249, 285).

3.     Needham's Testimony

Needham was a last-minute witness who only surfaced ten days before her testimony. (Needham T. at 165-66).  On cross-examination, Needham testified that from May 6, 1999 to November 20, 1999, she did not speak to anyone about what she saw on the evening of the homicide.  (Id. at 168-69).  However, she changed her testimony a few minutes later and admitted to speaking in November with Risin's brother, who gave the police her name as a witness.  (Id. at 169-170).

Needham lived at 1675 Lincoln Place, the building adjoining Williams's residence, and

across the street from 1430 Eastern Parkway.  (Id. at 142).  Needham's testimony was

substantially different from Johnson's.  Needham testified that she was sitting on her stoop

across the street from 1430 Eastern Parkway on the day of the homicide, and that she did not see

anyone out on the stoop of that building.  (Id. at 144, 150).  Furthermore, according to Needham,

when Risin arrived, he did not go to the stoop at 1430 Eastern Parkway, but instead sat on the

steps of her building and had a conversation with her.  (Id. at 144-45).  While Johnson did not

mention that Williams was on the street at that time, Needham testified that she heard Williams

call out a greeting to Risin.  (Id.).  Needham then watched Risin walk across the street and have a

conversation with Williams.  (Id. at 146).  She saw Williams walk back across the street and

meet two other men, who Needham recognized but did not know by name. (Id.).

　　　Needham testified that she saw Williams and the two other men enter 1430 Eastern

Parkway.  (Id. at 149).  She then heard a noise that sounded like a firecracker and "didn't pay it

no mind."  (Id. at 150-51).  She testified that the door of 1430 Eastern Parkway was open about

two inches when she heard this noise.  (Id. at 173-74).  She then witnessed Williams "walking

fast" out of 1430 Eastern Parkway and going into his building across the street.  (Id. at 151-53).

Needham, who saw Williams coming out of the building, did not testify that Williams was with

anyone, in contradiction to Johnson's earlier testimony that she saw Williams exit the building

with Ray Ray and B.  (Id. at 173).  Needham also testified to seeing Johnson running out of the

building, going across the street, and running back over.  (Id. at 176).  Moreover, Needham made

no mention of Car Wash entering the building after the shooting.  Later in the evening, when

Needham was in front of her building, she saw Williams returning to his building for a second

time.  (Id. at 157).  At that time, she overheard one of Williams's companions ask him, "why did

you shoot Santos?" (Id.). Williams responded, "he disrespect me." (Id.).

        4.     Testimony of the Remaining Witnesses

Officer Oliveria received a 911 call to respond to 1430 Eastern Parkway. (Oliveria T. at

187). When he got there, he found Risin lying on the kitchen floor of the first floor apartment.

(Id. at 188). Officer Oliveria testified that he also saw another female in the kitchen, who he

believed had made the 911 call. (Id. at 192). However, Johnson had earlier testified that a man

named Car Wash had made the 911 call. (Johnson T. at 49-50). Officer Oliveria also testified

that when he asked other tenants in the building about what had happened to Risin, everyone

responded that they did not know anything because they were sleeping. (Oliveria T. at 197).

Furthermore, Officer Oliveria did not see any blood on Risin's head or anywhere on his body.

(Id. at 198).

Bohr, the paramedic, arrived ten minutes later, (id. at 195), and testified that he initially

treated Risin for a possible seizure and head trauma, but not for a gunshot wound. (Bohr T. at

183). The next day, a CAT scan performed on Risin at Kings County Hospital revealed a .22

caliber bullet in the right side of his brain. (Shapiro T. at 274). Risin died two days after the

shooting from the gunshot wound. (Id. at 270). The medical examiner found no evidence that

Risin was shot at close range, although any such evidence may have been washed away by

medical personnel. (Id. at 274-75).

Detective Gallagher testified that Williams was read Miranda rights after his arrest when

he was brought to the 73rd Precinct on the night of May 10, 1999. (Gallagher T. at 224-25). The

next morning, Detective Gallagher questioned Williams about Risin's shooting. (Id. at 226-27).

According to Detective Gallagher, Williams told him that he was in a second floor apartment at

1430 Eastern Parkway when he heard a gun shot, at which point he came downstairs and saw Peanut running out of the first floor apartment. (Id. at 227). Williams stated that he remained on the first floor at 1430 Eastern Parkway until the ambulance came and took Risin away. (Id.). After Williams made this oral statement, Detective Gallagher left him alone and told him to reduce his statement to writing. (Id. at 228). Detective Gallagher later returned and read Williams's hand-written statement, which "was a different version than what he had verbally [given] [] earlier." (Id. at 228). Specifically, Williams left out the information about Peanut running out of the apartment, and explained that he had done so because he didn't think that Detective Gallagher believed that portion of the story. (Id. at 228-29). Detective Gallagher asked Williams to write a new statement recounting what he did and what he saw on that day. (Id. at 229). Williams then ripped up the initial statement, which Gallagher retrieved from the garbage, vouchered, and ultimately restored. (Id. at 229). Williams's second written statement included the information concerning Peanut. (Id. at 232-33). At a later time, on May 11th, a videotaped interview of Williams was conducted by the Police, which was played to the jury during trial. (T. at 234).

    5.  The Prosecutor's statements and Johnson's testimony about Williams being a drug dealer

    The prosecutor did not move in limine to admit uncharged crime evidence. However, he informed the jurors in his opening statement that Williams was present at 1430 Eastern Parkway to sell crack to Risin, and that the shooting resulted from a dispute over the sale of drugs. (T. 16-17). Defense counsel objected to the opening statement later in the day, and the court ruled that the uncharged crime evidence was admissible to establish motive. (Id. at 29-31). The court

overruled the objection and noted that the prosecutor intended to prove that there was an argument over "who was going to sell crack in that house." (Id. at 31). Later, Johnson was permitted to testify, over objection, that Williams was a drug dealer and that she had purchased crack from him on "plenty of occasions." (Johnson T. at 40). In summation, the prosecutor reminded the jurors about Johnson's testimony pertaining to Williams being a "crack dealer." (T. at 335). The court did not supply limiting instructions to the jury in reference to the uncharged crime. Williams's attorney, however, did not request any such instructions.

The court also did not charge the jury on the presumption of innocence that exists in a criminal trial. Although a copy of the charge was provided to Williams's attorney in advance of presenting it to the jury and counsel was asked him to review it, Williams's attorney did not object to the charge. (T. at 281).

B.     *Procedural Background*

On January 11, 2000, Williams was convicted by a jury of murder in the second degree and criminal possession of a weapon in the second degree. On January 22, 2000, he was sentenced to concurrent terms of imprisonment of fifteen years to life on the murder count, and three and one-half years on the weapons possession count (Barbaro, J., at hearings, trial and sentence). Williams appealed his conviction to the New York Appellate Division, Second Department. In his direct appeal brief, he claimed that: (1) his guilt was not proven beyond a reasonable doubt; (2) psychiatric records of a prosecution witness should have been admitted; (3) testimony about his drug dealing should not have been admitted; and (4) the court should have instructed the jury on the presumption of innocence. (Petitioner's Brief to the New York Supreme Court, Appellate Division, Second Department). On February 25, 2002, the Appellate

Division unanimously affirmed the judgment of conviction.  See People v. Williams, Slip Op.,

737 N.Y.S.2d 881 (N.Y. App. Div. 2d Dep't 2002).  In affirming the judgment, the Court wrote,

> we find that [the evidence at trial] was legally sufficient to establish the defendant's
> identity as the shooter beyond a reasonable doubt. Moreover, upon the exercise of our
> factual review power, we are satisfied that the verdict of guilt was not against the weight
> of the evidence. The defendant's remaining contentions are either unpreserved for
> appellate review or without merit.

Id. (citations omitted).  On May 10, 2002, the New York Court of Appeals denied leave to

appeal.  See People v. Williams, 98 N.Y.2d 773, 752 (N.Y. 2002).

On July 7, 2003, Williams filed a motion pro se to vacate the trial court's judgment

pursuant to New York Criminal Procedure Law § 440.10(1)(h), claiming that he was denied his

constitutional right to a public trial because his brother was excluded from trial, and that his

attorney was ineffective for failing to object to the prosecutor's opening statement.

Williams's former claim arose from the fact that the trial court was made aware during

the voir dire that his brother was seen talking to potential jurors.  (T. Voir Dire at 2-3).  At that

time, the Court noted that, "He has a right to be here."  (Id. at 3).  However, in order  to

determine whether the brother had polluted the jury, the trial judge proposed that he make the

following statement to the potential jurors:

> we have a new system now and the new system is that jurors come up and they wait
> outside and I have found that there are times when on the way up and waiting, people
> might be discussing this case.
>
> ***
>
> And that's not appropriate, and have any of you done that?  And if they say no, then okay.
> If he talked to them about the case, then [ ] [they will] say yes, in which case we'll have
> to take that step.  Is that agreeable?

(Id. at 5).  Williams's attorney agreed with the judge's instruction, and the judge again stated, "I

can't prohibit the brother from being in court." (Id.). The prosecutor, without any objection from the defense, told the Court Officer to ask Williams's brother to step down the hall while the judge inquired as to whether tampering of the jury had occurred. (Id.). It is unclear from the record whether these instructions were actually followed. The judge went on to say, "I think the record is clear we have a concern whether this brother has unduly influenced some of the jurors and I'm inquiring into that. After I resolve that question, he'll be allowed to be in the courtroom." (Id. at 5-6). Although the record does not reflect what happened next, Williams's own motion to vacate the trial court's judgment notes that the courtroom was reopened after the court determined that the jury was not contaminated. (Williams's Pro Se Motion to Vacate Judgment ("Motion to Vacate") at 9).

In his motion to vacate, Williams attached an affidavit from his brother, Willie Smith, providing that he was informed by a court officer on December 7, 2000, that he "could not be present in the courtroom while the jury was being selected" for the trial. (Motion to Vacate, Exhibit B). Willie Smith further states in his affidavit that when he subsequently attempted to attend his brother's trial, he "was not allowed in the courtroom by the same unknown court officer." (Id.).

On November 3, 2003, the Supreme Court, Kings County (Hall, J.) denied Williams's motion to vacate judgment both on the merits and as being procedurally barred. (Government's Affidavit ("Gov. Aff."), Exhibit G[5]). On February 6, 2004, the Appellate Division Second Department denied Williams's application for a certificate granting leave to appeal the denial of

_____

[5]The court's unpublished opinion has been provided by the Respondents in this case, and is referred to as Exhibit G.

his motion to vacate judgment.  <u>See</u> Exhibit H.[6]

Subsequently, on March 5, 2004, Williams filed the instant writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In his petition, Williams makes the following claims: (1) his guilt was not proven beyond a reasonable doubt; (2) psychiatric records of prosecution witness Folson should have been inspected by the trial court and admitted; (3) the District Attorney's opening statement and questioning of a witness about Williams being a drug dealer should not have been admitted; and (4) the trial court should have instructed the jury on the presumption of innocence.

Although Williams does not state additional grounds for relief in his petition, on pages 36-41 of his memorandum of law accompanying the petition, he raises two additional issues which he raised in his motion to vacate judgment.  He argues that he was denied his constitutional right to a public trial because his brother was excluded from the trial, and that his trial attorney was ineffective.

On July 28, 2004, the Government filed its Affidavit accompanied with a memorandum of law opposing Williams's petition.  Williams subsequently filed a reply to the Government's brief on September 9, 2004.

## II.  DISCUSSION

### A.    *Standard of Review*

The standard of review for habeas corpus petitions filed by state prisoners is set forth in 28 U.S.C. 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  Under section 2254(d), if Williams's claims have been fully adjudicated on the

---

[6] The court's unpublished opinion has been provided by the Respondents in this case, and is referred to as Exhibit H.

merits in state court, he must show that the state court proceedings:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established federal law as set forth by the Supreme Court "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 412 (2000). Further, a state court decision is an "unreasonable application" of the law "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.

Accordingly, this Court cannot grant the petitioner's writ if it "concludes in its independent judgment that the relevant state-court decision applied clearly established Federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The Second Circuit has warned, however, that while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" Francis v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks and citations omitted).

Furthermore, to determine whether AEDPA's deferential standard applies, the court must first determine whether the state court considered Williams's claims on their merits. Ryan v.

Miller, 303 F.3d 231, 245 (2d Cir.2002) (citations omitted).  A state court has adjudicated a state petitioner's claim on the merits when it "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001).  The state court's decision, however, need not "explicitly refer to either the federal claim or to relevant federal case law." Id.

**B.    *Williams's Claims***

*1.    Courtroom closure*

AEDPA's deferential standard of review applies to Williams's courtroom closure claim because it was adjudicated on the merits by the Supreme Court of New York.  (See Gov. Aff., Exhibit G).  That court also noted that the claim was procedurally barred.  In discussing the courtroom closure issue, the state court correctly identified the correct Supreme Court precedent of Waller v. Georgia, 467 U.S. 39 (1984), which sets forth a four-part test to determine whether a courtroom closure is justified in light of the defendant's Sixth Amendment right to a public trial.  (Gov. Aff., Exhibit G, at 2-4).  The four factors are: (1) the party seeking closure must advance an overriding interest that is likely to be prejudiced; (2) the closure must be no broader than necessary to protect that interest; (3) the trial court must consider reasonable alternatives to closure; and (4) the trial court must make specific findings adequate to support the closure.  Waller, 467 U.S. at 48.

Under 28 U.S.C. 2254(d), it must be decided whether the decision of the Supreme Court, Kings County on Williams's motion to vacate judgment involved an unreasonable application of the Waller standard.  There are, however, two separate issues that must be addressed here: (1) the brief closure of the courtroom to Williams's brother during the voir dire, which is clear from the

record; and (2) the alleged closure to Williams's brother occurring after the voir dire, which is not reflected in the record.

With regard to the brief closure during voir dire, the state court found all four of the Waller factors satisfied.  Williams's brother was seen talking to several potential jurors, and this appropriately caused the trial court to remove the brother temporarily to support the overriding interest in preventing the contamination of the jury.  From the record, it appears that the closure was only for a short period of time, which was needed to determine whether the brother spoke to any potential jurors.  The record does not indicate that the courtroom was closed to the public or any member of the Williams family other than his brother.  Furthermore, from what appears on the record, the trial court did not exclude Williams's brother from the entire trial, but only excluded him for the time necessary to determine whether the jury was contaminated.  Even Williams concedes that the courtroom was opened after "the court determined that the jury was not contaminated in any way."  (Motion to Vacate at 9; Williams's Br. at 36).  Lastly, because Williams did not object to the brief courtroom closure during the voir dire or when his brother was allegedly denied access during the trial, the trial court did not have an opportunity to make specific findings adequate to support the closure.  Therefore, I find that the decision rendered by the trial court regarding the courtroom closure during the voir dire correctly applied clearly established federal law as set forth by the Supreme Court in Waller.

Williams's claim of alleged courtroom closure to his brother during the trial (i.e. after voir dire) cannot be reviewed by this Court because Williams failed  to comply with valid state procedural requirements.  Judge Hall of the Supreme Court, Kings County held that Williams's motion to vacate judgment on this ground failed to state the dates or the times that his brother

was allegedly excluded from the courtroom. (Gov. Aff., Exhibit G at 6). The court, therefore, denied the claim because the motion did not satisfy the bare minimum procedural requirement of a violation pursuant to New York CPL § 440.30(4)(b). The Second Circuit has held that "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 2000); accord Harris v. Reed, 489 U.S. 255, 265 n.10 (1989). The state court relied on a state procedural default in denying Williams's motion, and he is, therefore, foreclosed from raising this claim on federal habeas review.

Williams, however, can overcome the procedural bar if he can either (1) demonstrate that the failure by this court to consider the federal claim will result in a fundamental miscarriage of justice, specifically the conviction of an actually innocent person, or (2) show good cause for the default and that he will be prejudiced by non-review of the claim. See Harris, 489 U.S. at 262; Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir. 1996). Williams has not demonstrated that he is actually innocent, but tries to show cause for the procedural default by arguing that he did not learn of his brother's exclusion until after the trial. (Williams's Reply Brief ("Williams's Reply"), at 2). However, this is insufficient to establish cause for a procedural default because Williams or his counsel could have discovered this factual predicate during the trial. See Murray v. Carrier, 477 U.S. 478, 486 (1986) ("the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."). Williams tries to show prejudice by arguing that his brother would have assisted counsel in conducting stronger cross-examinations of neighborhood witnesses who

17

were known by his brother. (Williams's Reply at 3). Williams, however, "must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). Williams has not carried this burden.

Furthermore, this Court cannot hold an evidentiary hearing to develop the factual basis of this claim because Williams has not shown that the courtroom closure to his brother could not have been previously discovered through the exercise of due diligence. See 28 U.S.C. § 2254(e)(2). Williams has not shown that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found him guilty of the underlying offense. Id. Willimas's request for habeas relief on this ground is therefore denied.

2.     *Ineffective Assistance of Counsel*

Williams claims that his trial counsel was ineffective because he failed to move for a mistrial or curative instructions following the prosecutor's opening statement informing the jury that Williams was at 1430 Eastern Parkway on the day of the shooting to sell drugs. (Williams's Brief at 38-39). The state trial court dismissed this claim as being procedurally barred pursuant to New York CPL § 440.10(2)(c) because Williams did not raise this issue on his direct appeal.[7]

---

[7]The Second Circuit has noted:

> "New York law requires a state court to deny a motion to vacate a judgment based on a constitutional violation where the defendant unjustifiably failed to argue the constitutional violation on direct appeal despite a sufficient record. N.Y.Crim. Proc. Law § 440.10(2)(c). The purpose of this rule is to prevent Section 440.10 from being employed as a substitute for direct appeal when the defendant was in a

The court also dismissed the claim on the merits.

Williams's claim of ineffective assistance of counsel is foreclosed because the New York Supreme Court expressly relied on a state procedural default as an independent and adequate state ground when it dismissed this claim. See Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 2000). Although Williams can overcome the procedural bar by either demonstrating that the failure to consider the federal claim will result in a fundamental miscarriage of justice, or by showing good cause and prejudice, he has made no such showing. Williams has neither demonstrated that he is actually innocent, nor has he shown good cause for the default and ensuing prejudice.

Williams's claim of ineffective assistance of counsel also fails on the merits. To prevail on this claim, Williams must show: (1) that his counsel's performance at trial "fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 687-88 (1984); and (2) that the performance caused him "substantial prejudice." Id. at 691, 694. With respect to the first prong of the Strickland test, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Id. at 688. In evaluating counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. at 690.

---

position to raise an issue on appeal or could readily have raised it on appeal but failed to do so."

Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003) (citations and internal quotation marks omitted).

The prejudice prong requires a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable," and that there is a reasonable probability that "but for" the claimed errors of counsel, the trial result would have been different." Strickland, 466 U.S. at 694. In other words, counsel's errors must undermine the court's confidence in the trial's outcome. Id. at 691.

In the memorandum of law supporting his petition, Williams points out that he wrote a letter to his trial attorney inquiring about his insight or strategy for not objecting to the prosecutor's opening statement. (Williams's Br. at 40). According to Williams, his attorney never responded to his inquiries. (Id.). Although I understand Williams's discontent with his court-appointed counsel's strategy, counsel's failure to move for a mistrial or curative instructions to the prosecutor's opening statement does not rise to the level of ineffective assistance of counsel. Based on the trial record, when Williams's counsel did object to the opening statement later in the trial, the judge overruled the objection and noted that "[i]t's a Molineux issue and I would allow it in under Molineux." (T. at 31). See People v. Molineux, 168 N.Y. 264, 293 (1901) (evidence of other crimes may be admitted to show motive).

It is unlikely that the jury's verdict would have been different if counsel had objected to the challenged portions of the prosecutor's statements or asked the judge for curative instructions in reference to the Molineux issue. I find that the performance of Williams's counsel at trial did not fall below an objective standard of reasonableness, and that counsel's alleged error did not deprive Williams of "a fair trial whose result is reliable." Strickland, 466 U.S. at 695. Furthermore, there is not a reasonable probability that "but for" the claimed errors of counsel, the trial result would have been different." Id.

3.      *Guilt Not Established Beyond a Reasonable Doubt*

Williams argues that the prosecution failed to prove his guilt beyond a reasonable doubt in light of inconsistent testimonies of a "crack addicted felon, and an alcoholic with a profound psychiatric history" who were "high or drunk during the shooting and thought the victim died from a drug seizure." (Williams's Writ of Habeas Corpus, at 6).

The Due Process clause of the Fourteenth Amendment "prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" Einaugler v. Supreme Court of the State of New York, 109 F.3d 836, 839 (2d Cir. 1997) (quoting In re Winship, 397 U.S. 358, 364 (1970)). A petitioner challenging the sufficiency of the evidence of his guilt in a habeas corpus proceeding "bears a very heavy burden." Fama v. Comm'r of Corr. Servs, 235 F.3d 804, 811 (2d Cir. 2000). Habeas corpus relief must be denied if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) (citation omitted); see also Farrington v. Senkowski, 214 F.3d 237, 240 (2d Cir. 2000). Furthermore, in making its assessment, a federal habeas court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial." Reddy v. Coombe, 846 F.2d 866, 869 (2d Cir. 1988). A court may neither "disturb the jury's findings with respect to the witnesses' credibility," United States v. Roman, 870 F.2d 65, 71 (2d Cir. 1989), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony." Fagon v. Bara, 717 F. Supp. 976, 979 (E.D.N.Y. 1989) (citing United States v. Zabare, 871 F.2d 282, 286 (2d Cir. 1989)). Moreover,

"a determination of a factual issue made by a State court shall be presumed to be correct," and Williams has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1).

The <u>Jackson</u> "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Jackson</u>, 443 U.S. at 324 n. 16; <u>see also</u> <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999) ("[a] federal court must look to state law to determine the elements of the crime"). In his submissions, Williams only challenges his conviction of murder in the second degree, and not the guilty verdict rendered against him for criminal possession of a weapon in the second degree. A person is guilty of murder in the second degree when, with intent to cause the death of another person, he causes the death of such person. N.Y. Penal Law § 125.25(1).

As Williams was charged with murder in the second degree, the jury was required to find that he possessed the "requisite intent for the commission of [] [this] crime[] and engaged in deliberate conduct to bring [] [it] about." <u>People v. Rosado</u>, 666 N.Y.S.2d 227, 229 (N.Y. App. Div. 3d Dep't 1997). The fact that there is no direct evidence of the intent does not prevent the prosecution from establishing intent. In fact, "[o]ften there is no direct evidence of a defendant's mental state and the jury must infer the mens rea circumstantially from the surrounding facts." <u>People v. Smith</u>, 79 N.Y.2d 209, 315 (N.Y. 1992).

Viewing the evidence in the light most favorable to the prosecution, and drawing all permissible inferences in the prosecution's favor, a rational juror could have found Williams guilty of murder in the second degree. As noted by the Appellate Division:

Viewing the evidence in the light most favorable to the prosecution, we find that it was

legally sufficient to establish the defendant's identity as the shooter beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence.

People v. Williams, Slip Op., 737 N.Y.S.2d 881 (N.Y. App. Div. 2d Dep't 2002) (citations omitted). Notwithstanding Williams's contention that the testimony of Johnson, Folson, and Needham was unreliable, this Court must defer to the findings of the jury, who credited their testimony and found that Williams shot and killed Risin. See Jackson, 443 U.S. at 319; United States v. Brown, 776 F.2d 397, 403 (2d Cir. 1985), cert. denied, 475 U.S. 1141 (1986) (the fact that some inferences drawn from circumstantial evidence are not inevitable does not mean that the evidence is insufficient to prove a defendant's guilt beyond a reasonable doubt).

Accordingly, Williams's claim that his guilt was not proven beyond a reasonable doubt is without merit and his request for habeas relief on this ground is denied

*4.   Williams's other claims*

Williams's argues that (a) psychiatric records of a prosecution witness should have been inspected by the court and admitted; (b) that the prosecutor's opening statement and testimony of a witness about Williams's being a drug dealer should not have been admitted; and (c) that the court should have instructed the jury on the presumption of innocence. These claims were reviewed by the Appellate Division, which found them to be "either unpreserved for appellate review or without merit." Williams, 737 N.Y.S.2d at 881. It is unclear from the state court's decision and the government's appellate level brief to that court whether the claims were rejected on procedural grounds or on the merits. The issue of whether a state court decision using this sort of language is adjudicated on the merits or was decided on an independent and adequate state procedural rule is currently unresolved in the Second Circuit. See Ryan v. Miller, 303 F.3d

231, 246 (2d Cir. 2002); <u>Fama v. Comm'r of Corr. Svcs.</u>, 235 F.3d 804, 810 (2d Cir. 2000); <u>but see</u> <u>Su v. Filion</u>, 335 F.3d 119, 126 n.3 (2d Cir. 2003); <u>DeBerry v. Portuondo</u>, 403 F.3d 57 (2d Cir. 2005); <u>Messiah v. Duncan</u>, 435 F.3d 186, 196 (2d Cir. 2006).  I find that these claims fail on the merits under AEDPA's deferential standard of review.

*(a) Psychiatric records of Folson*

Although the record is unclear about what happened after the trial judge issued a subpoena for the psychiatric records of Marie Folson, Williams's counsel did conduct an effective cross-examination of this witness.  A large part of the cross-examination focused on Folson's reliability given her extensive psychiatric history and hospitalization.

In his habeas brief, Williams cites to the Sixth Amendment of United States Constitution, and argues that the trial court abused its discretion in ordering the trial to proceed without the psychiatric records of Marie Folson.  (Williams's Br. at 27-30).  Under New York law, although the government has no affirmative duty to investigate psychiatric history of potential witnesses, <u>People v. Diaz</u>, 521 N.Y.S.2d 69 (N.Y. App. Div. 2d Dep't 1987), the records may be disclosed upon a finding by the court that the interests of justice significantly outweigh the need for confidentiality.  <u>See</u> New York State Mental Hygiene Law § 33.13(c).  The proper procedure in such a case is for the court to order production of the records and to have an <u>in</u> <u>camera</u> review after a showing of reasonable likelihood that the records might contain material bearing on the reliability and accuracy of the witness' testimony.  <u>People v. Gissendanner</u>, 48 N.Y.2d 543, 550 (N.Y. 1979).

After Folson's extensive psychiatric history was discovered during her cross-examination, the court ordered the prosecutor to produce Folson's psychiatric records and make every effort to

expedite their production, even after determining that Williams was not entitled to them. (T. at 250). However, when the records did not arrive in time, Williams's counsel did not ask for an adjournment or move for a mistrial on the grounds of the records unavailability. Instead, counsel proceeded to summation. (Id. at 251). Williams's claim on habeas review is essentially that his Sixth Amendment right to confrontation was violated when the trial court abused its discretion to proceed without the psychiatric records.

The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. XI. The Confrontation Clause provides the accused the right to cross-examine witnesses and to "test[ ] the recollection and sift[ ] the conscience of the witness." Mattox v. United States, 156 U.S. 237, 242 (1895). Cross-examination has been called the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158 (1970) (internal quotations marks omitted).

Under AEDPA's deferential standard, Williams's claim must be rejected unless the Appellate Division decision was "contrary to" or "an unreasonable application of, clearly established federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). Even though denying a defendant the opportunity to physically confront and cross-examine witnesses against him does violate the Confrontation Clause, see, e.g., Crawford v. Washington, 541 U.S. 36, 50-51 (2004), there is no clearly established federal law as determined by the Supreme Court that the Confrontation Clause is violated where the trial court has abused its discretion in allowing the trial to proceed without an in camera review of a witness's psychiatric record. Therefore, Williams's claim must be denied.

Even though the writ cannot be granted under AEDPA's deferential standard of review, I further find that Williams's claim would be denied even if the state court proceeding was reviewed *de novo*. Under Supreme Court precedent, "trial judges retain wide latitude, insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986). Furthermore, the Second Circuit has ruled that "[a]ll erroneous rulings that improperly restrict cross-examination under state or federal rules of evidence do not necessarily implicate the Confrontation Clause." Harper v. Kelly, 916 F.2d 54, 57 (2d Cir. 1990); see also Henry v. Speckard, 22 F.3d 1209, 1218 (2d Cir. 1994) (Leval, J., concurring) (cases finding Confrontation Clause violations typically involve gross foreclosures of the opportunity to show bias or disability, not simply a partial curtailment). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility." United States v. Roldan-Zapata, 916 F.2d 795, 806 (2d Cir. 1990) (internal quotation marks omitted), cert. denied, 499 U.S. 940 (1991). Williams's counsel was effective in questioning Folson about her psychiatric history, and likely chose not to move for adjournment until the psychiatric records arrived because Folson was effectively cross-examined about her psychiatric history without the records. As Folson was effectively cross-examined about her psychiatric history, the Confrontation Clause was not violated, and Williams's claim has no merit.

*(b) The prosecutor's opening statement and the testimony that Williams was a drug dealer*

Williams argues that by permitting the prosecution to introduce testimony that he was a drug dealer who often sold crack to Rose Johnson, the trial court deprived him of his due process right to a fair trial. (Williams's Br. at 31). Williams also challenges the fact that, although the

prosecution did not present any evidence to show that Williams went to 1430 Eastern Parkway to sell drugs to Risin on the day of the shooting, "Johnson was permitted to testify over objection that she purchased crack from [ ] [Williams] on 'plenty of occasions'" (Id. at 31-31) (quoting Johnson T. at 40). The trial court ruled that the uncharged crime evidence was admissible to establish motive because the prosecutor intended to prove that there was an argument over "who was going to sell crack in that house." (T. at 30-31). Under New York law, evidence of uncharged crimes may not be used for the purpose of showing a defendant's propensity to commit the charged crime. See People v. Molineux, 168 N.Y. 264, 291 (N.Y. 1901). However, "when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule." People v. Beam, 57 N.Y.2d 241, 250 (N.Y. 1982).

Rulings by state trial courts on evidentiary matters are generally a matter of state law and pose no federal constitutional issue. Estelle v. McGuire, 502 U.S. 62, 67-69, 71-73 (1999). Even assuming that the state's evidentiary ruling was erroneous under state law, Williams cannot be granted habeas relief unless the alleged error resulted in a trial that deprived him of fundamental fairness, thereby violating his constitutionally guaranteed due process rights. Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir. 1988); accord Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) ("The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence is so extremely unfair that its admission violates fundamental conceptions of justice.") (internal quotation marks and citations omitted). To violate "fundamental conceptions of justice," the evidence "must have been sufficiently material to provide a basis for conviction." Dunnigan, 137 F.3d at 125 (internal quotation marks

and citations omitted).

The prosecutor's opening statement and Johnson's testimony were not offered to prove Williams's propensity to commit the charged crimes. Instead, Johnson's testimony that she purchased crack from Williams was relevant to establish Williams's motive for committing the crimes charged. See People v. Yanes, 668 N.Y.S.2d 660 (N.Y. App. Div. 2d Dep't 1997). As the evidence was relevant and not admitted for propensity purposes, there was no error of state law and certainly no violation of "fundamental fairness." See Hall v. Annets, 2004 WL 2028029, at *2 (E.D.N.Y. Sept. 7, 2004) (evidence that the petitioner threatened to harm the victim's daughter properly admitted where it assisted the jury in understanding the relationship between the parties and events leading up to the crime). I find that the admission of this evidence was consistent with New York law. Even though the trial court did not give curative instructions to the jury, the admission of the uncharged crimes evidence "viewed objectively in light of the entire record before the jury" would not have "remove[d] a reasonable doubt that would have existed on the record without it." Dunnigan, 168 F.3d at 125. I thus find that the alleged-erroneous evidentiary ruling did not deprive Williams of a constitutionally recognized right. Therefore, Williams's will not be granted habeas relief on this ground.

*(c) The presumption of innocence charge*

Williams argues that the writ should be granted because he was deprived of due process by the trial court's inadvertent omission to charge the jury on the presumption of innocence. (Williams's Br. at 35). To sustain a claim that a jury instruction was improper, Williams must show "not merely that the [jury] instruction is undesirable, erroneous, or even universally condemned, but that it violated some right which was guaranteed to the defendant by the

28

Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973) (internal quotation marks omitted); accord Davis v. Strack, 270 F.3d 111, 123 (2d Cir. 2001). Thus, an improper charge will be found to violate Williams's constitutional rights where "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence," Boyde v. California, 494 U.S. 370, 380 (1990), or "violates the Constitution," Estelle v. McGuire, 502 U.S. 62, 72 (1991). Morever, whether the charge contained an omission or misstatement of law is relevant in determining prejudice to the defendant. Henderson v. Kibbe, 431 U.S. 145, 155 (1977) ("An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.").

Although the trial court stated at the charge conference that the "boiler plate" charges would be included in its final instructions, including "the presumption" of innocence, the court did not instruct the jurors on that charge. (T. at 246). Before delivering it to the jury, the court asked both Williams and the prosecutor to review the charge. (T. at 281, 381). Williams's counsel did not object to the charge. In its charge, the court gave a strong and unequivocal instruction on the government's burden of proof, (T. 360-63), rendering the charge, when read as a whole a correct interpretation of the law. See California v. Brown, 479 U.S. 538, 541 (1987). The lengthy charge on the burden of proof given to the jury was as follows:

> The standard of proof required in every criminal case is proof of guilt beyond a reasonable doubt. . . . So, proof of guilt beyond a reasonable doubt, what is it? It does not require the People to prove an accused guilty beyond all possibility of doubt or beyond a shadow of a doubt. It requires the People to establish the accused guilty beyond a reasonable doubt.

> Therefore, before you may convict the accused, each of you must be satisfied that the credible evidence, the evidence that you accept, is sufficient to convince you beyond a reasonable doubt that the accused is, in fact, guilty and that the accused

29

is, in fact, the person who committed the crimes charged.

(T. 360-61).  The charge then included six paragraphs explaining in greater detail what

reasonable doubt is, and continued as follows:

> Let me emphasize that the prosecution has the burden to prove beyond a reasonable doubt
> not only all the elements of the crimes, as I will define then for you in a minute, but also
> that Mr. Williams is the man who committed them.

While it is true that the charge failed to explicitly state the presumption of innocence, it was

nonetheless more than sufficient to accord Williams due process.  Cupp, 414 U.S. at 147-48  ("a

single instruction to a jury may not be judged in artificial isolation, but must be viewed in the

context of the overall charge") (citations omitted).  The clear declaration of the Government's

burden of proof negates the need to directly state the innocence presumption.  If the Government

is required to prove guilt beyond a reasonable doubt, the defendant is by implication presumed

innocent. Thus, the court's inadvertent failure in not instructing the jury on the presumption of

innocense directly can hardly be said to have "infected the entire trial." Id. at 147.  Therefore,

Williams's claim on this ground is denied.

### III. CONCLUSION

For the reasons discussed above, Williams's petition for a writ of habeas corpus is

DENIED.  A certificate of appealability shall not issue.  The Clerk of the Court is directed to

close the case.

SO ORDERED.

Date:   May 15, 2006                              _____/s/_____
        Brooklyn, New York                        Nicholas G. Garaufis
                                                  United States District Judge

30